UNITED STATES v. 76 FIVE-GALLON KEGS, etc. (VETA et al., Claimants).

No. 2000.

District Court, D. Wyoming.

Aug. 18, 1930.

Albert D. Walton, U. S. Atty., and T. Paul Wilcox, Asst. U. S. Atty., both of Cheyenne, Wyo.

Joseph C. O'Mahoney and Roderick N. Matson, both of Cheyenne, Wyo., for claimants.

KENNEDY, District Judge.

This is a libel proceeding in which it is sought to condemn, confiscate, and cause to be sold or destroyed certain property alleged to have been had and possessed and intended for use in violating the National Prohibition Act (27 USCA). William Veta and Edward Leff are alleged to have been possessed of

the property. They have appeared and by appropriate pleading assert their ownership of the property in question, deny the allegations of the libel in regard to the unlawful possession under the Prohibition Act, and seek a dismissal of the libel, together with the return of the property. A hearing was had, evidence offered supporting the various contentions of the parties, and the matter is now before the court for determination.

The property seized and sought to be condemned in the libel proceeding is as follows: 75 five-gallon kegs, 86 one-gallon jugs, 23 ten-gallon kegs, 3 fifteen-gallon kegs, 108 one-half gallon jugs, 3 two-gallon kegs, 1,416 pint bottles in crates, 1 gallon keg, 1 fifty-gallon barrel, 10 sacks of corks, and 1 box of barrel bungs. There appears to be no dispute about the description of the property, and with the exception of one or two bits of evidence, reference to which will be more directly made later, there is not any substantial disagreement as to the facts in the case. A summarized review of such facts is substantially as follows:

Veta and Leff are the proprietors of a coal yard in the city of Cheyenne, and in connection with such business are also dealers in secondhand materials such as are described in the libel. Veta has been engaged in such business for twenty years last past, and for the past seventeen years Leff has been associated with him in such business. It has been their practice during all of this period, in addition to dealing in coal, to buy and sell casks, kegs, barrels, and bottles. They have been for many years merchants well known in their own community dealing in these classes of property. They testify that both before and after the enactment of the National Prohibition Act they bought and sold barrels, kegs, and bottles of various types and kinds, including whisky barrels, Coca-Cola barrels, oil barrels, and various other types of barrels and kegs, which they could pick up at different places, and that these would later be sold and disposed of in either wholesale or retail lots. Witnesses upon the stand support the testimony of the claimants themselves, that they have for many years made purchases of barrels and kegs of various types and descriptions for treating and storing pickles and saurkraut, and that the desirable kegs and barrels for this purpose were those which had been made and were adapted or used for containing whisky. Older kegs which had previously contained whisky were sometimes bought and sawed in two for the purpose of making flower boxes. Bottles and jugs were at times purchased from the claim-

ants by the wholesale merchants of the city. Kegs and barrels which had formerly contained whisky were sometimes sold to them by those who had apprehended persons using such containers in the unlawful possession of intoxicating liquor, and it appears beyond dispute that at one time the claimants had purchased about 150 kegs which had formerly contained whisky in cases under prosecution from the sheriff of Laramie county and at another time some of a similar character from the chief of police of the city of Cheyenne. These barrels and kegs were kept by the claimants in a sort of warehouse at their place of business, although some of the barrels were permitted to set in the yard. They testify that they were kept in the warehouse for the purpose of keeping them out of the sun for protection against shrinkage and against theft at night when the warehouse was kept locked. The goods were never at any time kept on display in a conspicuous place, nor does it appear that they were advertised in any way for sale. As customers came, sales were made in the regular manner as to the desired kind and quantity.

On the 17th of June, 1930, two national prohibition agents, concealing their official entity, went to the place of business of claimants for the ostensible purpose of making a purchase of some kegs and bottles. They found one of the claimants there and made a purchase of two kegs and a few glass jugs, and at the same time made inquiry in regard to the purchase of larger quantities of the same articles. One of the claimants then and there stated that, if they desired to purchase goods in larger quantities, it would be necessary to confer with his partner as he himself knew little about prices of this class of goods. On the 20th of June the prohibition agents again returned to claimants' place of business, found both there, and again ostensibly entered into negotiations for a larger quantity of kegs, informing one of the claimants in connection with the negotiations that he (the agent) wanted oak and not cypress kegs, and made inquiry as to whether or not the claimants would deliver said kegs out of the city, to which the claimant made the reply that they made no deliveries out of the city. The agent also made inquiry of one of the claimants as to his price on 100 new five-gallon kegs and was informed that he did not have any where near such number of new kegs on hand, and that, if they were to be purchased, he would have to order them from a supply house in Denver. The agents then left but returned that afternoon and made arrangements to purchase 15 five-gallon new

kegs, 5 ten-gallon new kegs, and 5 five-gallon used kegs, promising to return later and secure them, at the time making a deposit of $10 upon said purchase. About 7:45 that evening the principal prohibition agent returned with a truck to the yard of the claimants, purported to make a purchase of a truck load of the kegs, caused them to be loaded upon the truck which was driven by another prohibition agent, in the loading of which one of the claimants assisted, asked the claimant to figure the price of the goods so purchased, and at this point the agents advised the claimants of their identity, placed them under arrest, and seized the property described in the libel, which they removed and has since been kept in the custody of the Prohibition Administrator.

The question of fact in dispute is in regard to the conversation which took place between the prohibition agents and the claimants at the time they visited the premises of claimants upon the several occasions concerning the purposes for which the goods sought to be purchased were intended to be used. The prohibition agents testify that they told the claimants they wanted the kegs for the purpose of aging whisky, and that they desired the delivery to be made at night, so that there would be less danger of the nature of the load being seen. One of the agents likewise testified upon the stand, although he did not include the same in his affidavit attached to the libel, that he told the claimants that he was running a large still out in the country. The claimants testify that the agents did not state the purposes for which they intended to use the kegs, nor was a still mentioned, and that the delivery was asked to be after business hours for the reason that the man with the truck to be used for hauling could not be in until nearly 8 o'clock, upon which representation the claimants agreed to come back to their place of business for the purpose of making the delivery, which they claimed was not an unusual circumstance, inasmuch as they had frequently done this to accommodate country people in making various kinds of purchases from their establishment.

It might be somewhat difficult to render a decision in this case were it to be based upon the divergent testimony as between the prohibition agents and the claimants concerning the particular items to which reference has just been made. The testimony of the claimants can scarcely be classified with that of the ordinary bootlegger, for the reason as it appears that they have been responsible merchants in their community for many years, engaged in a business which, to say the least,

has not been directly connected with the commercial side of intoxicating liquor. Nor need I entirely overlook the effects of my observation and experience that, in the case of agents who make a practice of attempting to induce the commission of crime for the sole purpose of basing a prosecution thereon, the testimony of such agents must of necessity be carefully scrutinized. However, I shall prefer in the first instance to consider the case from a standpoint most favorable to the government, at least to the extent that the prohibition agents may have made known to the claimants that they intended to use the containers purchased for the purpose of aging whisky. With this situation as a theoretical set-up of the case, we find two propositions to be considered.

First, the claimants contend that under 27 USCA § 39, which is the portion of the prohibition statute relied upon by the government for the seizure in this case, the government agents acted illegally because they did not first secure a search warrant. The section referred to in part reads as follows: "It shall be unlawful to have or possess any liquor or property designed for the manufacture of liquor intended for use in violating this chapter or which has been so used, and no property rights shall exist in any such liquor or property. A search warrant may issue as provided in sections 434 to 454, and 456 of Title 17, and such liquor, the containers thereof, and such property so seized shall be subject to such disposition as the court may make thereof."

I am inclined to the view that a proper construction of the phrase, "a search warrant may issue," would be that authority is thereby given for the issuance of a search warrant upon those occasions when a search warrant would ordinarily be required, as distinguished from a construction that under the section a warrant was the basis of a seizure. Under the circumstances of the case at bar, the prohibition agents were present when the claimants admittedly had possession of the property under consideration and when the sale of such property was admittedly made, followed by the immediate arrest of the claimants upon their own premises where the property then was virtually in the presence and sight of both agents and claimants. Under such circumstances, as I view it, a search warrant would be a superfluous thing and unnecessary, because upon the arrest of the possessor personally engaged in the commission of an alleged crime they (the agents) would have the right to at least seize the class of property,

the possession and sale of a portion of which they claimed constituted the violation. My views are in a measure supported, as I see it, by the opinion of Judge Hand in the case of Avignone v. United States, 12 F. (2d) 509 (C. C. A. 2nd Cir.) where that court at page 510 says: "That a libel of information lies in such a case as this we do not doubt. The procedure by search warrant prescribed by section 25, tit. 2 (Comp. St. Ann. Supp. 1923, § 10138½m [27 USCA § 39]) is not exclusive as a method of forfeiture. It is true that U. S. v. Franzione, 52 App. D. C. 307, 286 F. 769, so holds, and that we avoided the point in U. S. v. Specified Intoxicating Liquors [C. C. A.] 7 F. (2d) 835; but the implication of Dumbra v. U. S., 268 U. S. 435, 45 S. Ct. 546, 69 L. Ed. 1032, corroborates what seems to us the almost inevitable conclusion. U. S. v. Franzione, supra, went on the idea that there must be a search warrant for every seizure, a conclusion contrary to our decision in Rouda v. U. S. [C. C. A.] 10 F. (2d) 916, and answered by Carroll v. U. S., 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, unless all the discussion in that case is to be strictly confined to seizures under section 26, tit. 2 (Comp. St. Ann. Supp. 1923, § 10138½mm [27 USCA § 40]), which seems to us unlikely. The seizure at bar certainly could not be followed up in any other way, not being upon search warrant. It appears to us that the analogy of the procedure in customs cases obtains."

It must accordingly be held that the seizure on account of the lack of a search warrant under the particular circumstances in this case will not be set aside.

The second phase of the case requiring consideration concerns the point as to whether or not, under the particular circumstances here outlined, the property is brought under the proscription of section 39 above quoted, as "property designed for the manufacture of liquor intended for use in violating" the National Prohibition Act (27 USCA). In this respect counsel for the government strongly rely upon the recent case of Danovitz v. United States, 281 U. S. 389, 50 S. Ct. 344, 74 L. Ed. 923, and frankly confess in open court that the announcement of this decision was the inspiration for the attack upon claimants' property. Unfortunately, perhaps, for its practical use in consideration of the case at bar, that case is an opinion based upon a search warrant proceeding, and gives no statement of the facts making up the transaction in which the question was raised. At page 396, of 281 U. S., 50 S. Ct.

344, 345, Mr. Justice Holmes, in speaking for the court, says: "The argument for the petitioner cannot be helped by amplification. It is obviously correct if the word 'manufacture' be taken in the strictest and most exact sense. But the word may be used in a looser way to express the whole process by which an article is made ready for sale on the open market. P. Lorrilard Co. v. Ross, 183 Ky. 217, 223, 209 S. W. 39. As the purpose of the Prohibition Act was to 'suppress the entire traffic' condemned by the act, United States v. Katz, 271 U. S. 354, 357, 46 S. Ct. 513, 70 L. Ed. 986; Donnelley v. United States, 276 U. S. 505, 513, 48 S. Ct. 400, 72 L. Ed. 676, it should be liberally construed to the end of this suppression, and so directs, title 2, § 3, of the Act, Code, title 27, § 12 (27 USCA § 12). The decisions under the revenue acts have little weight as against legislation under the afflatus of the Eighteenth Amendment. We are of opinion that the word was used in this looser way, and that if the empty containers and the other objects seized were offered for sale in such a mode as purposely to attract purchasers who wanted them for the unlawful manufacture, as we interpret the word, they were designed for that manufacture and could be seized."

A fair analyses of this opinion as it stands would seem to be that in certain instances property which may be and is used for the manufacture of liquor, but may at the same time have other uses, comes within the scope of the Prohibition Act, and thereby subject to seizure. Counsel for the government assert that the facts in the case appear at length in the opinion promulgated by the Circuit Court of Appeals of the Third circuit, reported as Feitler v. United States, 34 F. (2d) 30. Reference to certain portions of that opinion purporting to state the facts, reveals language, excerpts of which are taken as follows, quoting from page 32:

"This includes liquor found in several partly filled cans and jugs, more than a hundred empty 5-gallon cans, several thousand empty bottles of different shapes, many with labels already on them and packed in cartons ready for delivery, several thousand cardboard cartons of different kinds, several hundred demijohns, several hundred bags and boxes of corks, sealing wire, wrappers for whiskey bottles, twine, caps for bottles, crimping machines, labeling machines, siphons and filters, a large number of assorted labels, cans of glyco, flavoring nuts, glycerin, gin extract, syrup, and (aside from other articles too numerous to mention) finally, 402

whisky barrels all containing whisky chips and more than half containing a small quantity of whisky. * * *

"This was not a heterogeneous stock in trade open to casual purchasers desiring bottles, corks, barrels, syrup and other wares for personal or commercial purposes. The stock was so selected, kept and arranged as to make separate and distinct liquor set-ups. For instance, if a person should want to outfit an illicit gin plant he could buy from the respondents everything necessary to that business except, perhaps, the basic alcohol in large volume. He could buy gin extract and flavoring, gin bottles, labels, strip stamps, sealing wire, corks, caps and cartons. If another person, about to engage in the illicit manufacture and sale of Scotch whisky, should desire an outfit for liquor of that kind, he could get it in every detail except, perhaps, the basic alcohol in large quantities. And so a rye whisky outfit, in which would be included whisky barrels, whisky chips and whisky dregs, which, besides supplying a small quantity of alcohol, impart the flavor of rye whisky to the concoction. These outfits or set-ups were so complete that they even simulated popular pre-war brands both in shape of bottles and dress such as 'William Penn,' 'Golden Wedding,' 'Gordon Gin,' 'Gibson.'

"The respondents were without doubt bootlegger outfitters."

 In many respects the facts in the case at bar seem to justify the conclusion that the claimants and their stock of goods can scarcely be classified with those in the Feitler Case. While in that case the court said that it was not dealing with a heterogeneous stock in trade open to casual purchasers desiring bottles, corks, barrels, etc., the evidence in the case at bar shows beyond dispute that this was such a stock. The stock in the case at bar was not selected, kept, and arranged to make separate and distinct liquor set-ups. It contained no labels, flavoring materials, nor was there any quantity of intoxicating liquor present at the time of the seizure. Certainly a contention could not be made in this case that, absent the alleged statement of the prohibition agent to the claimants that he desired to purchase the kegs for the purpose of aging whisky and the somewhat dubious request that he be permitted to come later in the evening and haul them away, there would

be anything to justify the action of the prohibition agents in arresting the claimants and seizing their property. Does this circumstance invest the case with an element of intent to possess property designed for the manufacture of liquor under the Prohibition Act? I believe that the true import of the court decisions upon this question is that a person must be such a dealer in articles as to justify the conclusion that he is in business for the purpose of catering to and assisting manufacturers of liquor intentionally to carry on their illicit trade before he may be said to be under the ban of the law. For example, if a person should go to a grocer and negotiate a purchase of a hundred pounds of sugar, and during the process of such negotiation should inform the grocer that he intended to use the sugar in the manufacture of liquor, must we assume that the grocer would be forced to refuse the sale under those circumstances or lay himself open to the pains and penalties of prosecution under the Prohibition Act, or to an adjudication that he possessed property intended for use in violation of the act so as to forfeit his right to his entire sugar stock? As a matter of fact, the purchaser in that instance might be telling a falsehood in regard to his intended use of the sugar, as in fact were the prohibition agents in attempting to purchase the barrels and jugs, for they admittedly never intended to use the property in violation of the Prohibition Law. The scope of this section of the act must not be so construed and broadened that it places in jeopardy the liberty and property of legitimate dealers, although such property may be partially adapted to uses in the manufacture of intoxicating liquor. There are undoubtedly enough instances involving the clearly intended use of property of the kind and character here seized in violation of the Prohibition Act to warrant the constant endeavor of those engaged in its enforcement, without entering into speculation as to the frame of mind of those engaged as legitimate merchants. At least, a certain amount of speculation would have to be indulged in the case at bar to sustain the government's contention.

For the reasons stated, an order may be submitted dismissing the libel and directing the return of the property here involved to the claimants, reserving to the libelant proper exceptions.